SAMUEL McDOWELL *vs.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF WILMINGTON AND BRANDYWINE.

If the maker of a note has funds in the bank on general deposit after the note falls due, the bank is bound to apply them in payment of the note, or the indorser is discharged.

Giving time to the drawer discharges the indorser.

Equity will distinguish between principal and surety, though the nature of the security be such as to make them all principals in a court of law.

The oath of one witness, with corroborating circumstances, will outweigh an answer on oath.

*Quere.* Will not the oath of one witness, unsupported, establish a fact against the answer of a corporation?

Under peculiar circumstances a court of equity will assess damages, or send an issue to law to have them assessed.

Surety paying the debt of his principal, stands in the place of the creditor, and is entitled to an assignment of all securities, original and collateral.

APPEAL from the decree of the chancellor.

The bill stated: That Thomas McDowell made a promissory note, dated 6th October, 1817, for $500, in favor of complainant, which was indorsed by him and discounted by the bank, for the accommodation of the maker. This note was afterwards protested for non-payment, and put in suit and judgment obtained against the indorser on the 7th April, 1819, for $541 16. No suit was instituted against Thomas McDowell, the maker. That after the said judgment was recovered against the indorser, the bank became indebted to the maker in several sums, amounting to $500, which, instead of applying to the payment of the said note, they paid over to Thomas McDowell. That they afterwards entered into an arrangement with the said Thomas McDowell, who was a notary public, that he should do the protesting for the bank, and that of the fees for such protests 62½ cents for each note protested should be credited to the said note, and the balance paid to him in càsh; which agreement was to continue until the note was paid, and payment in any other manner was not to be required of him whilst he continued to do the protesting. Under this agreement $80 was paid to Thomas McDowell and $150 credited to the note. The said agreement was made without the privity or consent of Samuel McDowell, the indorser. That ever since April, 1819, Thos. McDowell had made general deposites of money in the

47

bank, which were passed to his credit and paid out on his checks, and the balances due him frequently exceeded the amount of the said note, out of which it ought to have been paid by the bank. That no demand was made on complainant for payment of the said judgment of April, 1819, until the year 1829, when he, having sold thirty-six shares of the stock of the said bank, called for the purpose of transferring the same on the books of the bank, which was refused, as the bank claimed a lien on the stock for the payment of said judgment: in consequence of this refusal, complainant was unable to complete his said sale, and he has been further injured by the depreciation of the stock. That the bank still refuses to permit a transfer of the said thirty-six shares of stock, and has caused a scire facias to be issued for the purpose of reviving and executing the said judgment against complainant.

Prayer. A perpetual injunction against any further proceedings at law upon the said judgment; that defts. may be decreed to pay to complainant the damage he has sustained from their refusing to permit him to transfer his stock; and for general relief.

The answer admitted the making, indorsing and discounting of the note, and that the same was discounted for the accommodation of the maker, and the proceeds passed to his credit. That Thomas McDowell had received from the bank since judgment was obtained against the indorser of said note several sums of money due him for fees as notary public and justice of the peace, and that the said sums were not retained and applied to or set off against the said note, there being no direction of the said Thomas McDowell, nor any obligation on the defts. so to do: the said sums were paid in cash or deposited as cash by Thomas McDowell "as justice of the peace, and by him drawn out by his checks." That an arrangement was made between the bank and Thomas McDowell in relation to protests as stated in the bill; but the defts. denied that such arrangement was to continue until the note was paid off, or that payment thereof was not to be demanded of said Thomas McDowell in any other way whilst he continued to perform his part of the agreement. They admit the payment to Thomas McDowell, for protests under this agreement, of $80 in cash, and about $150 by way of credit to his note; and that he has made deposites since April, 1819, "as a justice of the peace, but not in his own individual capacity and name;" but they deny that the balances due at any time equalled the said note. They did not demand the said judgment of complainant, because he was insolvent, and had been discharged under the insolvent laws of this state. They admit their refusal to permit him to transfer his bank stock until he paid the said judgment, and also that they have issued a scire facias on the said judgment for the purpose of reviving the same, and have obtained judgment thereon; that at the time of refusing to allow the said transfer, and before and ever since, there was a by-law of the said bank, duly and legally made, "that any stockholder being indebted to the bank shall not be at liberty to sell, assign or transfer his stock, or any part thereof whilst his debt shall remain due and unpaid, and that such dividends shall remain pledged to the bank until such debts be paid, or they shall be arranged to the satisfaction of the board; provided that no stock at a fair market price shall be retained beyond what

is sufficient for the security for the debt that may be payable, "which, by-law, they alledge, is a sufficient authority for their said refusal. (*Ante* 27.) The answer further set forth: That Samuel McDowell sued the bank for refusing to let him transfer the said thirty-six shares of bank stock and on the trial of that suit a verdict was rendered for the defts. under the charge of the court, that the said by-law was a good and reasonable by-law and a sufficient ground for refusing to transfer said stock, and that the same stood pledged for said debt, and that it was not incumbent on said bank to apply the deposites of the said Thomas McDowell to the said note; a judgment having been rendered against the said Samuel McDowell, there must be an actual payment or release to discharge the same."

The deposition of Thomas McDowell proved the agreement in relation to fees for protests as stated in the bill, and "that this arrangement was to continue until the debt was paid, and it was expressly understood at the time of making it, that recourse was not to be had to the indorser." He also swore that he had no separate account with the bank as justice of the peace or notary public.

On the hearing the chancellor dismissed the bill, with costs, and the case now came up on appeal from this decree.

*Bayard,* for complainant, contended that the agreement made by the bank with Thomas McDowell in relation to protests was such an agreement as discharged the indorser. It was an agreement for giving time, substituting another mode of payment, and putting it out of their power, at least for a time, to proceed against the principal. If time be given to the principal by contract, the surety is discharged. Is the agreement proved? Is Thomas McDowell a competent witness? The rule is that a party to a note is not competent to deny its original validity, but he is competent as to any subsequent matter, such as payment, discharge, &c. Is the oath of one witness sufficient to prove it? The answer of defts. speaks very generally on the subject of this arrangement, admits its general terms, but denies its extent; it is not on oath, and therefore not entitled to the credit of an individual answer, for then oath would stand against oath; but even in that case the testimony of one witness, with *concurring circumstances,* would be sufficient to outweigh the answer and establish the fact. Do not the circumstances in this case fully corroborate the deposition of Samuel McDowell? 3 *Merivale,* 272. 2 *Vezey, jr.* 543.

Second. Supposing it is proved that the bank had in its power a fund which might have been applied to the payment of this note, they were bound in equity to make such application of it, and if they have paid it over to the maker, the indorser is discharged. Even where a balance was paid over to the principal on an erroneous settlement with him, the surety was held to be discharged. *Law* vs. *East India Company.* 4 *Vezey,* 824.

If this indorser is discharged, the court will decree a satisfaction of the judgment against him. The question then arises, whether the complainant is not entitled to compensation in equity for his damage occasioned by the refusal of defts. to permit him to transfer his stock. I admit that if damages can be recovered at law, a court of equity will not allow them; but when they arise out of a transac-

tion which cannot be developed in a court of law; if the injury be established in equity that court will give satisfaction. It is but carrying out the principle of relief, and applying it to an injury already established. And if this court cannot assess the amount of the damage it will send an issue to a court of law for this purpose. *Butler* vs. *Pendergrast,* 4 *Brown Par. Cases,* 174; *Lanney* vs. *Werry et al. Idem* 630.

*Wales,* for the defendants. When a party comes into a court of equity asking the exercise of its extraordinary powers to protect him against a legal liability, he should show that he has done full equity on his part. How does Samuel McDowell present himself here? He indorsed a note for his brother, a man in insolvent circumstances, the money was obtained from the bank on his credit; yet from the moment his liability commenced he has sought to evade it. He defended the original suit; judgment went against him. Then, if ever, he should have set up this defence which was equally available at law as in equity, and having failed to do so he is concluded by the judgment. A scire facias was issued to revive this judgment, and, though resisted, judgment again went against him in that action. He then brought an action on the case against the bank for not permitting him to transfer his stock though he was thus indebted to them, and in this action he was nonsuited. He then went into chancery and was dismissed from that court, and he is now here in the last stage of resistance to a just and fair claim. I consider, First. Whether the arrangement with Thomas McDowell in relation to protesting for the bank was an agreement to give time, such as would discharge the indorser. Is any such agreement proved? It is distinctly denied by the answer. How is it set up? By the oath of one witness, and he the drawer of the note and the brother of the party. The rule is settled that one witness cannot establish a fact denied by the answer and there is no distinction in this respect between the answers of corporations and individuals. A corporation necessarily answers under the corporate seal, and that seal makes the act as obligatory on them as the oath of an individual can make his answer; it has all the validity and effect of an answer on oath. If there is less personal responsibility there is also less temptation from personal interest to depart from the truth. What was this agreement even as spoken of by Thomas McDowell? Certainly not an agreement to *give time.* No time was given; no obligation not to sue; nothing in fact but an arrangement by which the bank placed business in the hands of McDowell, on the understanding that a part of the fees should be paid towards satisfaction of this debt. Can the court believe that the bank agreed to abandon all other means of collecting this debt and particularly that they released the indorser on such a loose arrangement as this. There was no motive for such an agreement; no consideration; if made it would have been a nudum pactum. McDowell was in no wise bound to perform his part of the agreement. He was insolvent; had taken the benefit of the insolvent laws; and even his deposits in bank had to be guarded by a special account kept in his official character as the bank books show. Mere forbearance to sue will not discharge an indorser. There must be an express giving of time by a legal agreement, i. e. with consideration

and binding on the parties. This arrangement has none of the features of such an agreement. *Chitty on Bills* 378; 1 *Law Lib.* 112. Second. Did the conduct of the bank in permitting Thomas McDowell to check out the funds which stood to his credit as a general depositer in the bank discharge the indorser? I consider this question as closed by the ision of the Superior Court in the suit of the present compagainst the bank. The court held that the judgment changed the condition of the parties in relation to this matter; and that nothing could be set up as a defence to the judgment but payment or release, &c.

*Rogers*: on the same side. It was not competent for the bank, without the direction of the depositor to pay these deposits to the note. What would be the condition of our banks if they were obliged to seize upon the funds of their dealers placed on general deposite and appropriate them to the payment of their notes whenever they should fall due; and what would be the condition of depositors? In every instance where the drawer had funds in bank they would have to be applied to his notes or his indorsers would be discharged. This would be extremely inconvenient both for the bank and its depositors. Deposites could not be made subject to such embarrassments. The nature of these transactions and the reason of the thing distinguish it from the common case of an individual creditor paying money to his debtor. *Law vs. The East India Co.* does not therefore reach this case, if it even establishes the general principles contended for. Both the payment of deposites and the giving of time were defences available, if at all, in the action on the note or on the scire facias. In the latter action this defence was set up and is still undecided. The arrangement between the bank and Thomas McDowell was not however, a giving of time. It might have been determined at any moment by the bank proceeding on the judgment or the notary refusing to act; or even while the notary continued to act it was in the power of the bank to proceed. It is admitted that McDowell had the power to put an end to it by refusing to act and the power must have been reciprocal. But is this a case of *principal and surety?* All the defence of the other side proceeds on this idea. In the origin of the business it was so; but at the moment of protest and notice the character of Samuel McDowell was changed; he was no longer a conditional debtor; it was his debt as a principal. Much less is he to be considered a surety after judgment. If he had given a bond to the bank he could not afterwards set up this defence; neither can he after giving a judgment. The judgment in this case was by confession. Not only was the character of principal and surety destroyed by the judgment but the cause of action was destroyed; the note itself was merged in the judgment. I can't think the court will be obliged to consider the remaining question whether a court of equity can give damages. The cases cited by Mr. Bayard do not establish such a power or practice. The first is a case of fraud:—in the other there was a suit going on at law and the parties went into equity for a discovery: that court aided them and sent them back to law to establish their damages.

*Bayard*, in reply: I agree that the confession of a judgment is a waiver of any defence existing at the time; but, of course, not after.

The change of security may so far alter the character of the parties as that you cannot investigate that character in a court of law;. but the rule in equity is different. This defence, if set up to the note, would be available at law as well as in equity; but the courts of law look at all the parties in a judgment as principals and this defence can't be set up there.

*The Court* stopped him on this point. A court law cannot look beyond the judgment, either to investigate the character of the parties or the nature of the debt. It considers it as a debt due absolutely from all the defendants as principals. A court of equity has larger power and better means of investigating these matters with a view not merely to the legal liabilities of the parties but to the particular equity of the case. It can go beyond the judgment and ascertain the original position of the parties deft. and their liabilities not only to the creditor but as between each other as principal and surety. See *Hardcastle* vs. *Commercial Bank.* (*a.*)

*Bayard* resumed—I proceed then to the question of fact. Is the agreement for giving time proved? There is a manifest distinction between the answers of a corporation and of individuals. The former are the mere suggestions of counsel. Both the conscientious obligation and the legal sanction are less. There can be no indict-

(*a*) Garrett S. Hardcastle, assignee, &c. complainant below, plaintiff in error *vs.* The Commercial Bank of Delaware respondents below, defendants in error.

In the late High Court of Errors and Appeals. June Term, 1831. Appeal from Chancery, Kent.

. All the Judges (except Rowland) sat—it being an appeal from the decree of the late Chancellor Ridgely. This cause was argued at the last term; but there being but four judges present; and a division; a re-argument was ordered.

*Frame*, Attorney General, for appellant, reads the bill.

March 16, 1819. Judgment Commercial Bank *vs.* J. Clayton and G. Blackiston, principals, and Jacob Biddle, surety. Real debt $1900 00 Goods of Biddle, the surety, sold on this judgment, and $815 93 of the proceeds applied to it. September 15, 1821, lands of Clayton and Blackiston, the principals, sold on this judgment for $10336 51 more than sufficient to pay it. November 5, 1821, Biddle assigned his interest in this judgment to Philip D. Fiddeman; January 7. 1822, Fiddeman assigned to Hardcastle. Jacob Biddle was indebted to the Bank in other sums of money. Frame also reads the answer. Bank insists upon the right to set off the $815 93 against debts due them by Biddle.

*Mr. Frame.* The lands of the principals being sold to the amount of the judgment, part of which the surety's goods had so paid, Biddle became entitled to an assignment of the judgment, to the amount of the sum so paid by him; and was entitled to the lien of said judgment on the proceeds of these sales. The cause was decided below without argument. A surety paying the debt of his principal stands in the shoes of the creditor not only as to the principal debt, but also as to all collateral engagements. He is entitled to an assignment of all liens, original and collateral. Surety coobligor in a bond, paying it off, is a *specialty* creditor of the principal; paying off a judgment, is a judgment creditor of the principal. 1. *Mad. Ch.* 235; 11 *Vezey* 22; 2 *Vernon* 608; 1 *Atk.* 135; 1 *Mad.* 236; 2 *Mad. Rep.* 437; 1 *John. C. R.* 412; 4 *John.* 132, 530. This is the general principle

ment for perjury. The reason therefore of requiring two witnesses to prove a fact denied in the answer fails—there is no oath against oath. But this answer does admit an agreement. Was there no consideration for it? The bank got the services of Thomas McDow-

of equity previous to, and independent of, our act of Assembly. *Digest.* 43. We don't claim specifically under this act, but upon the general prin- ciple of equity. The act is with us; but it is not the origin of the princi- ple. Biddle then by the payment of this money stood in equity as the plff. in that judgment pro tanto; entitled to be reimbursed out of his principal's lands when sold. Fiddeman's interest and right, and Hardcastle's, are the same with Biddle's. The right of the Bank to set off this fund against Bid- dle's debts could not arise until they got possession of the fund, to wit: at the November Term, 1821, previously to which all the interest of Biddle had been assigned for a bona fide consideration to Fiddeman. A empowers B to collect a sum of money, and then assigns to C. Afterwards B col- lects. Can he set off debts due to him from A against the claim of C on the money so collected? Certainly not.

*Bates,* for the respondents. The Chancellor decided on the ground that Biddle had not paid any part of this judgment so as to entitle himself to an assignment under the Act of Assembly; and that there being an equal equi- ty in the Bank with the complainant, and the Bank in possession of the fund it was entitled to retain it. 1st. Biddle has not entitled himself to an as- signment under the act of Assembly. Takes this distinction. A surety paying only a part of a judgment is not entitled to an assignment as to that part, but only upon his paying the whole, or the balance; fully satisfying the debt. This is the meaning of the act, and it is reasonable, for other- wise the debtor might be subjected to several executions by different plain- tiffs for different parts of the same debt; and the proceedings of the surety might embarass the creditor in the collection of the balance of his debt. 2nd. But none of the cases cited establish it as a general principle of equi- ty that a surety can go into chancery, and compel an assignment upon pay- ing all the debt. 1 *Vez. sen.* 339; 2 do. 570. But if the surety is entitled to an assignment where is the case showing that his assignee is entitled to such assignment? All the equity to which this claim was subject at the date of the assignment follows it in the hands of the assignee. This is admit- ted. Biddle was then and still is indebted to the Bank. At the sale the Bank purchased the land of Clayton and Blackiston, who have thus always had an equity to set off the debts due them from Biddle against his interest in this judgment or the avails of these lands.

*J. A. Bayard,* in reply, for appellant. Remarks on 1 *Vezey, sen'r.* 339. The decision in that case is opposed to the principles of equity, to the pre- vious decisions and to the dictum of Lord Hardwick himself in 1 *Atk.* 135. This and the other cases cited by Mr. Bates are contradicted by the cases in 2 *Vern.* 608; 11 *Vezey* 22; 1 *Atk.* 135; 2 *Mad.* 569; 1 *Johns. C. Rep.* 409; 4 do. 132, 530, 8. This last was the case of a part payment only. There is no reason for distinguishing in the application of the principle be- tween the payment of a part and the whole. The equity is the same. On the receipt of these funds by the Bank after the sale of the land of Clayton and Blackiston was not Biddle or his assignee entitled to an assignment of the judgment? Does his owing them release their obligation to assign? If Biddle had offered to pay the judgment could they have refused an assign- ment because he would not pay his other debts? Not so. But here was a payment by Biddle applicable and applied to this judgment. They were, therefore, bound to assign and they might then seek the possession of the fund in payment of other debts by attachment or otherwise. We stand in

# 376 McDowell vs. Bank of Wil. & Bran.

ell as notary by the agreement which they could not have got by any legal process. He was insolvent. His person was discharged from arrest. This then was a sufficient consideration. And if they had

the situation of Biddle on the 5th November, 1821. The Bank had no right to the fund until after the November Term—26 November, 1821. The purchaser was not bound to pay the money until then, nor the creditor (the Bank) entitled to receive it. The equity then of the Bank to set off their debts against this sum did not accrue until after he had assigned it to Fiddeman. Biddle had a right in this case to prefer Fiddeman, one of his creditors, to the Bank, another creditor. I have considered the question on the principles of equity generally; I now refer to our statute and I contend that the party here was entitled to an assignment under the equity of that act. There is no ground of distinction between the payment of the whole and a part. I admit that the whole must be paid before an assignment can be demanded, but after the debt is discharged, the surety who pays a part of it has a right to an assignment pro tanto. A different construction would make the act nugatory; for if the principal debtor paid ever so small a sum, the interest for example, which in nine cases out of ten he does, the surety paying all the balance would have no remedy under this act. The law is a remedial one and ought to be liberally construed.

Harrington, Chief Justice of the Supreme Court delivered the opinion of this court:

"This bill was filed by the assignee of Jacob Biddle, claiming to stand in the condition of a surety who had paid the debt of his principal, and demanding of the creditor an assignment of his lien against the principal, or the benefit of that lien to the amount so paid by the surety. There is no dispute about the facts alledged as the foundation of this claim; the only doubt is about the equity arising upon the facts and the right of complainant to relief in this suit as against the defts.

The Commercial Bank were the plffs. in a judgment dated the 16 March, 1819, for the real debt of $1900 00 against James Clayton and George Blackiston as principals and Jacob Biddle as surety. By virtue of execution process on this judgment the goods of Jacob Biddle the surety were sold, in May, 1821, and the sum of $815 93 a part of the proceeds of the sale, applied to this judgment. The lands of Clayton and Blackiston, the principals, were subsequently sold, on the 25th of September, 1821, and 17th January, 1822, for a sum sufficient to pay off this judgment and all others of prior and equal date to it, and to leave a balance more than equal to the sum so paid by Biddle the surety. The proceeds of the sale went into the hands of the Bank who still retains them. On the 5th November, 1821, Biddle, for a valuable consideration, assigned all his interest in this judgment and all his rights, both at law and in equity, to an assignment or otherwise arising from the fact of his having paid the aforesaid sum of money, to Philip D. Fiddeman, who, on the 7th January, 1822, assigned to the complainant, Garrett S. Hardcastle. At the date of the assignment to Fiddeman, Biddle was and still is indebted to the Bank. Under these circumstances his assignee files his bill against the Bank, claiming the benefit of the Bank's judgment against Clayton and Blackiston, to the amount of $815 93; or rather claiming that sum immediately from the Bank, so much having been made by virtue of the lien out of the lands of Clayton and Blackiston. The Bank resists this claim on the ground of Biddle's indebtedness to them in other sums which they have a right to set off against this demand; and on the principle that their equity being at least equal to that of the complainant, they having possession of the fund are entitled to retain it.

The general principle of equity undoubtedly is, that a surety paying the

proceeded for the judgment in violation of this agreement any court would have stayed the execution. I did say that as long as McDowell performed his part the Bank could not proceed against him, and Mr. Rogers infers that as he had the power to put an end to it, so

debt of his principal is entitled to stand in the condition of the creditor; to be substituted in his place in relation to the principal debtor, is entitled to the benefit of all remedies which the creditor may have against such principal; and may require an assignment of all securities either original or collateral which the creditor may hold against the principal to perfect his remedy for the demand which by paying the debt he acquires against the principal. This is a rule of equity independent of our statute; founded on the first principles of justice and propriety that he who in fact owes the debt shall pay it, and that he shall be as much bound to pay to his surety who is compelled by the creditor to discharge the debt as he was bound to pay the creditor himself. If this be the principle, and this its foundation, we apprehend that there is no propriety in distinguishing in the application of the rule between the payment of the whole debt and the payment of a part,— at least as between principal and surety; but as it regards the creditor this equitable lien cannot be enforced by the surety until the whole debt is paid, without affecting his rights; he shall not therefore be compelled to assign until the whole debt is paid. But this being done, the same principle of equity which substitutes the surety paying the whole debt in place of the creditor, will equally extend and apply to the surety paying a part, pro tanto, to the extent of his payment.

With these principles settled, let us examine the situation of all the parties in relation to their rights and claims on the 5th November, 1821, when this assignment was made to Fiddeman. Biddle, the surety of Clayton and Blackiston had paid by the sale of his goods the sum of $815 93 to the Commercial Bank in part satisfaction of their judgment against Clayton and Blackiston. At the time of the payment of this sum Biddle acquired a claim against Clayton and Blackiston to the amount of his payment, and an equitable lien on their land through the medium of this judgment, pro tanto; but of which lien he could not avail himself until the whole debt was paid. At the same time the Bank lost their lien on the land of Clayton and Blackiston under this judgment, to the same amount. The debt, as to the Bank, was so far satisfied and paid and they had no right to enforce this judgment against Clayton and Blackiston to any greater extent than the balance of their demand, except for the benefit and through the medium of the equitable lien of Jacob Biddle; nor to receive upon this judgment the proceeds of the sale of Clayton and Blackiston's lands to any larger amount than the balance due them, except in the same manner for the benefit of Biddle and by virtue of his equitable lien. It is important in this case to ascertain precisely the manner in which the Commercial Bank become possessed of this fund, and their rights over it; for it is from this possession of the fund that their equity to retain it is said to arise; and if it should appear that they got possession of it solely through the medium of the equitable lien of another and an equally meritorious claimant of the fund, no wise indebted to them, we shall have no difficulty either in balancing the equities in point of time or grade, or in settling the other question as to their right of offsetting debts. On the 5th of November then, 1821, Jacob Biddle, having a claim against Clayton and Blackiston; having an equitable lien on their lands to a certain amount through the medium of a judgment in the name of the Bank, assigns this claim and lien for a valuable consideration to Philip D. Fiddeman. Was there any thing in this transaction illegal or unjust as it

48

had the Bank. Non sequitur as to the surety. The *making* of the agreement discharged the indorser; it is only the *performance* of it that would discharge the maker. The length of time given is not important: if the Bank for one moment put it out of their power to proceed against the drawer the indorser was discharged. Pay-

regarded the Bank? Did it deprive them of any rights, or any remedies, or of the benefit of any offsetts or discounts? Not so. Biddle had no claim against the Bank, and therefore there was nothing against which the Bank could offset claims on him;but he had a claim against Clayton and Blackiston which any of his creditors were equally entitled to obtain an assignment of as the Bank, and which he chose to assign to Philip D. Fiddeman. The assignment then was good, and it carried the interest of Mr. Biddle in this judgment. On the 25th of September, 1821, the sheriff sold the lands of Clayton and Blackiston bound by this judgment for a sum sufficient to pay the whole amount of it, and all other judgments of prior or equal date, and he returned this sale to the November term, 1821, which was not earlier than the 26th of November of that year. After the 26th of November then, this judgment is to be fully satisfied; and there are funds of the principal debtors sufficient to pay off not only the balance due the Bank, but the sum already paid by the surety and now due to his assignee. Who then is entitled to the money? Had the Bank any claim to it further than to the amount of the balance unpaid to them? And were they not bound immediately on the receipt of this balance, according to the principles already settled, to substitute the surety in their stead as it regards the amount paid by him, and give him the benefit of the judgment lien? If they were so bound equity will consider that as done which the party was, according to equitable principles, bound to do; and will regard this money as properly payable to the person entitled to it by assignment from the surety. A majority of the court are therefore of opinion, two members dissenting *(Johns Ch'r. and Stout)* that the complainant below, Garrett S. Hardcastle, who stands in the same case with Philip D. Fiddeman, is entitled to the sum so paid by Biddle; that the Bank having got possesion of the fund at a time when it belonged to Fiddeman is not entitled to set off against his claim the debts due to them from Biddle, and that there is no equity arising to them from their possession of the fund which will countervail the equity of Biddle's assignee, or prevent a court of equity from granting him the relief prayed for; and consequently that the decree of the chancellor must be reversed.

We have purposely considered this case upon general principles of equity independent of our act of Assembly, as we deem it unnecessary in this case to decide upon the extent of that act; but the strong inclination of a majority of the court is to give that law a liberal construction, co-extensive with the principles here announced, both as regards the payment by a surety of the whole of the debt of his principal, and the payment of a part only of that debt. The wording of the act, which was not particularly referred to in the argument, is at least not opposed to the extension of a beneficial rule equally applicable in its justice to the one case as the other.

This court does therefore order, adjudge and decree that the decree of the chancellor in this cause be reversed; and that the respondents, the Commercial Bank, pay to the complainant Garrett S. Hardcastle the sum of $815 93 with interest from the date of the payment of this sum to the Bank by the sale of Biddle's goods; and that the respondents pay the costs in the court below, and in this court.

Decree reversed.

*Frame* and *Bayard*, for appellant.
*Bates*, for respondents.

ment of deposits. I hold that deposits made in a Bank and passed into a general account between the depositor and the Bank become a debt due from the latter to the former against which they have the right to set off any debt of the same general character which may be due from him to them. I would rest the whole case on this point. They are not bound to exercise the right of set off as against the principal, but if they do not the surety is discharged. For it is established on obvious principles of equity that if I have a demand against one person as a principal debtor and another who is merely his surety, if a fund comes into my hands sufficient to pay it, my duty to the surety requires that I shall retain that fund, and if I suffer it to go out of my hands he is discharged. I will not stop to examine the pretence that these deposits were made in a special character. It is too slight to found an argument upon; and if made out it would establish a case of fraud to which the Bank would necessarily be a party: a mere cover to defraud McDowell's creditors. Will this court allow damages? To say that the case cited by me is a case of fraud is no answer to it. I cited it not because it was a case of fraud but because it established that in a *proper case* where, either because of fraud or from other circumstances a party had not relief at law, a court of equity could and would give damages. The other case is mistaken by Mr. Rogers.

*Judge Black* delivered the opinion of the court.

*Black, Justice:*

On the 6th of October, 1817, Thomas McDowell made his promissory note for $500, payable in sixty days to the order of his brother, Samuel McDowell, which the latter indorsed, and which was discounted by the Bank of Wilmington and Brandywine: It was duly protested at maturity for non payment, and a suit instituted on it by the bank against the indorser, in the supreme court, to March T. 1818, in which there was a judgment by confession on April 7, 1819, for $541 16. A scire facias issued on this judgment to Nov. T. 1829, to which the matters hereinafter stated in relation to the deposites made in the bank by Thomas McDowell, and the agreement between him and the bank, made in June, 1827, were (inter alia) specially pleaded. To this plea the plff. in the action demurred, and judgment was rendered on the demurrer for the demurrants, on November 6th, 1830, on the ground that the original judgment could not in a *court of law* be held to be discharged by parol or matters in pais, but only by a release or actual payment; that if such defence could be proved, it could only avail or be entertained in a court of equity. Both drawer and indorser took the benefit of the insolvent acts between 1817 and 1827. In August, 1819, Thomas McDowell opened an account in the Bank of Wilmington and Brandywine, and his deposites between that date and June, 1822, exceeded $4000; from June, 1822, to June, 1827, they were above $9000; after June, 1827, they were something over $200. The monies deposited were drawn out, from time to time, by Thomas McDowell, on his checks. In the account of Thomas McDowell, as it stands in the ledger of the bank, the letters "J. P." are added to his name, from August, 1819, to June, 1822. In none of the accounts subsequent to this date are these letters added, but the accounts stand in the name of "Thomas

McDowell. The bank insist that this account kept with them by Thomas McDowell was kept in his official character as a justice of the peace, (he holding that office) and was a special account in that character, and not a general account embracing his own money, and that it continued in that character during the entire period up to 1831, notwithstanding the letters "J. P." were not appended to the depositor's name in the ledger after June 1822. Two bank books, such as are furnished by the bank to those who keep accounts with them, containing entries, made by the officers of the bank, of monies deposited and checks drawn, from October, 1820, to August, 1831, are produced in evidence, which are thus commenced: "Dr. the Bank of Wilmington and Brandywine in account with Thomas McDowell, Cr." In neither of these books are the letters "J. P." added to the name of Thomas McDowell. The checks drawn during the period of the account were signed Thomas McDowell, without any addition. In the scratcher of the bank, in which the original entries of deposites are made, some, and perhaps most of the deposites made in the year 1819 are entered to the credit of "Thomas McDowell, J. P." but there are none so entered after 1819. After the year 1821 a number of notarial fees are credited Thomas McDowell in his bank account as deposited. The balances in favor of Thomas McDowell on inspecting the books appear at times to have been considerable; on some occasions $400, and on one upwards of $500. His fees for protesting, prior to June, 1827, amounted to $495 99, and since that time to $378 49, of which last sum $241 01 have been applied to his note, under the arrangement hereafter mentioned, and $137 48 deposited and carried to his credit in his account with the bank before referred to.

In June, 1827, at the instance of the bank, an arrangement was made between them and Thomas McDowell, by which it was agreed that the latter should receive of his notarial fee for each note protested by him for the bank, sixty-two and a half cents in cash, and that the residue of each fee should be applied to his note. The arrangement to this extent is admitted by the answer. The fees of protest under this agreement amounted as before stated to $378 49, it having been acted on by the parties for several years. The bank by its answer denies that this arrangement was to continue until the amount due on the protested note was paid, or that it was not to require of Thomas McDowell payment in any other manner while he continued to perform his part of the agreement. On the other hand, Thomas McDowell, who has been examined as a witness in this cause, swears "that the arrangement was to continue until the debt was paid, and that it was expressly understood at the time of making it, that recourse was not to be had against the indorser."

In February, 1829, the complainant was owner of thirty-six shares in the Bank of Wilmington and Brandywine, which he contracted through his brother to sell to Robert Porter at ten dollars per share. The bank refused to permit the stock to be transferred, on the ground that he was indebted to the bank on the aforesaid judgment, and that by a by-law of the corporation no stockholder who is indebted to the bank is at liberty to transfer any part of his stock while his debt remains unpaid. To recover damages for the injury sustained by this

refusal, the complainant instituted an action in the superior court against the bank, of which a trial was had. The bank relied on the aforesaid judgment and by-law as a defence to this action, which the complainant attempted to meet by proof of the arrangement of June, 1827, and the deposites made by Thomas McDowell in the bank, but was overruled by the court, on the ground that the judgment being a debt of record, its discharge in a *court of law* could only be shown by a release or actual payment, and that the judgment being a legal demand, could not in that court be successfully resisted on equitable grounds, however strong; that such defences could avail in equity alone. After the expression of this opinion by the court, who also recognized the validity and legality of the by-law, the plff. submitted to a nonsuit.

The value of each share of stock in the Bank of Wilmington and Brandywine was by act of the Legislature in February, 1829, fixed at seven dollars. The shares were to be filled up to thirty dollars, stockholders to have the preference; but if they declined, a further stock was to be created to the amount necessary to fill up the original capital. The complainant declined filling up his shares, on the ground, as he alledges, of the power claimed by the bank over his stock. The value, in August, 1833, of the full shares was $40 50, or $10 50 above par, and of the old shares not filled up, $10 50, or $3 50 above par. The complainant cannot now fill up his shares, as the time allowed the old stockholders to do this has passed. The bill prays that the judgment against Samuel McDowell may be decreed to be entered satisfied and a perpetual injunction awarded, and that he may be compensated for the damage he has sustained by the refusal to permit the transfer of the bank stock. On hearing, the chancellor dismissed the bill.

An indorser is a conditional debtor up to the period at which he becomes fixed by a due demand and notice; from that time he becomes a principal debtor, to whom alone the holder may resort. In a suit *at law* upon the note he may successfully defend himself by showing that his rights have been fettered, abridged, or suspended. If, however, judgment be obtained against him, this can only be discharged or gotten rid of *at law* by showing the debt to be paid or released, the original character of the liability being merged in the judgment, a court of law cannot recognize him in the character of a surety. That court is estopped by the judgment, and cannot look beyond it. But this rule does not prevail in a court of equity, which will look beyond the judgment and inquire into the origin and nature of the transaction and the condition and character of the parties, and if the original condition and character was that of surety, extend to him the benefit of those equitable principles which the character of a surety properly may demand. In the court of chancery, therefore, and in this court, on an appeal from the court of chancery, an indorser will be viewed as a surety and entitled to such relief as a surety may on principles of equity claim, notwithstanding a judgment may be obtained against him.

The complainant claims to be relieved from this judgment, first, on the ground that the bank, since the judgment was obtained, have had in their possession and under their control funds of the drawer to

an amount more than sufficient to have discharged this judgment, which they had the power and which it was their duty to have appropriated to the judgment, but which they have paid to the drawer, and that by so doing the claim of the bank is as against Samuel McDowell equitably discharged.

The bank alledges that the account with the bank by Thomas McDowell was not a general account, but a special one with him as justice of the peace, comprising only the deposit of monies received by him in that character, and not his individual funds. The only proof produced by the defts. to sustain this position is, that during the year 1819 most if not all the deposits appear from the scratcher or original book of deposit to be placed to the credit of "Thomas McDowell, J. P." and that in the ledger of the bank, from August, 1819, to June, 1822, his account has the heading of "Thomas McDowell, J. P." On the other hand, in none of the accounts in the ledger since June, 1822, are the letters "J. P." added, but they stand merely in the name of Thomas McDowell. The bank books furnished by the bank to Thomas McDowell as a depositor, in which the officers of the bank state the account and make the entries, and which should contain the specific special character of the account, if it was understood by the parties to be a special and not a general one, contains no designation of this kind. In each book it stands as a general account—"Dr. the Bank of Wilmington and Brandywine, in account with Thomas McDowell, Cr." Nothing is added to show that it was with him as a justice of the peace, or in any other character than that of the ordinary general account kept by a depositer with the bank. It also appears from the checks drawn by Thomas McDowell, that they are signed merely Thomas McDowell, without any addition thereto of J. P. or of any thing else. It also appears that the notarial fees due him by the bank were deposited to his credit in these accounts; these certainly, as the bank well knew, did not belong to an account of justice of the peace. In addition to all this, Thomas McDowell, in his deposition, swears that he had no separate account as justice of the peace, but that any moneys received by him in his official capacity and deposited in the bank were deposited and credited to him as his own personal funds. That the bank could not have received it as a special account, but a general one, is very strongly to be inferred from their payment of the checks drawn by Thomas McDowell, without any addition to show it was drawn on a special fund. In our judgment it can only be considered as a general account of Thomas McDowell with the bank, such as is usually kept by depositers with a bank. It was under the entire control of Thomas McDowell, individually. His creditors might have attached any money due on it. The bank had the right to appropriate to the note indorsed by the complainant, or any other debt due to it from Thomas McDowell, so much of his money remaining in bank to his credit on this bank account as might be sufficient for this purpose; and as they have neglected to make this appropriation to the note, the important question arises, whether, in relation to the complainant, it was not the *duty* of the bank to have done so, and whether by neglecting this duty and paying over to Thomas McDowell the money in their hands belonging to him, the complainant is not in equity held discharged from all

claim by virtue of the aforesaid judgment. On what principle of justice or equity can a creditor whose debt is due and the payment of which may be enforced, and who has on a running account money in his hands belonging to the debtor, the means of payment entirely under his own control and at his disposition; who refuses or neglects to make the appropriation or set-off, and voluntarily hands over to the debtor the money which he might have retained; upon what principle of justice can such a creditor in a court of equity claim to hold the surety bound, after the debt had been in point of fact paid, if the creditor had elected to say so or to so consider it. The creditor could have set off the debt and charged it in the account, and having the power was it not his duty to do so in justice to the surety. If Thomas McDowell had sued the Bank for any balance of the account, he would have been compelled to have allowed this note as a set off. Suppose, in such a suit, the Bank had chosen not to have pleaded this note as a discount, and the entire balance of account thus allowed by them to be recovered—would not the judgment against Samuel McDowell have been in a court of equity held as satisfied by such a course of conduct? Deciding as we must do on equitable principles, we consider that the right of set off or appropriation of these moneys in Bank to the note of Thomas McDowell, became a duty towards the complainant, in order to protect him from loss, and as the deposites amounted, in the course of the years of which an account is given, to several thousand dollars, and the balances at times as high as $400 and $500, and the means of payment at the will of the creditor, we consider that the Bank cannot, under these circumstances, be allowed to enforce against Samuel McDowell the judgment obtained against him. The decision of the master of the rolls in the cause of *Law* vs. *The East India Co.;* 4 *Vezey* 330, (if an authority were wanting for so obvious a principle of justice) fully sustains the conclusion to which the court have come. In that case the agents of the company had paid into the hands of the administrator of the principal debtor a large sum of money supposing that sum of money really to be due from the company. In relation to the sum thus paid the master of the rolls says "nothing is more clear than as between them (the company) and the surety, they could never demand that sum."

The complainant claims relief from this judgment, secondly, on the ground of the arrangement between the Bank and Thomas McDowell, in June, 1827, by which, as he alleges, time was given to the principal to pay the note and the rights of the surety impaired. Thomas McDowell swears that the arrangement as to protesting was to continue till his debt was paid. If such was the arrangement then the period of payment was postponed and the rights of Samuel McDowell were so far impaired as that he would no longer be held responsible in equity on this judgment, for the consideration of personal services which Thomas McDowell was to render, and which the Bank could not compel, was a sufficient consideration for the time granted. It is true Thomas McDowell is the only witness as to this arrangement, but there are concurring and corroborating circumstances, which, were it necessary, would perhaps lead the court to say would countervail the positive denial of the fact in the an-

swer, even if it had been under oath. From the view we have taken of this case it does not become necessary for us to decide, whether the oath of one witness will not avail over the denial of an answer of a corporation under seal. The reason of the rule that has obtained is, that you have oath against oath, and that in such case further proof or corroborating circumstances are called for, or the answer will neutralize the oath of a single witness. This reason does not exist in the case of a corporation and we confess we entertain strong doubts whether the testimony of one witness should be annulled by an answer wanting the sanction of an oath.

We are of opinion on a consideration of the whole case, that the decree of the chancellor is erroneous and should be reversed, and that the defts. be perpetually enjoined from proceeding on the aforesaid judgment against the complainant. We decline ordering an issue as asked, although we don't doubt the power of the court to do so in a case like the present, if we thought it necessary, as we have enough before us to attain what is equitable between the parties. By refusing to permit the transfer, the defts. have deprived the complainant of interest on $360 the price at which the stock was sold, from February, 1829. This is all that in equity he is entitled to. He had sold the stock and the right of filling it up would on the transfer have gone to the assignee and would not have belonged to him. In this respect he is not damnified. The shares of stock, according to the proof, is now worth more than ten dollars. We decree him interest on $360, from the tenth of February, 1829, to the tenth of January, 1834, $109 80, the date of the last dividend. The dividends between these periods to be retained by the Bank and all subsequent dividends to belong to complainant. The defts. to pay costs.

The following decree was entered on the record:

"And now to wit, this ninth day of June, A. D. 1834, this cause having come on to be heard before the court of Errors and Appeals at the present term thereof, and the causes of appeal, pleadings, proofs and exhibits having been read and heard by the court, and the matters of appeal being debated by counsel; it is ordered, adjudged and decreed by the court that the decree of the chancellor, bearing date the 24th day of February, A. D. 1834, dismissing the bill of complaint of Samuel McDowell the complainant in the court of Chancery be reversed. And it is further ordered and adjudged by the court, that the president, directors and company of the Bank of Wilmington and Brandywine the respondents in this appeal be perpetually enjoined and forever restrained from any further proceedings at law against the said Samuel McDowell on the judgment rendered against him on the seventh day of April, A. D. 1819, at their suit in the late Supreme Court of the state of Delaware, held at Newcastle for Newcastle county, of the March term, A. D. 1819, for the sum of five hundred and forty-one dollars and sixteen cents, numbered on the docket of said court No. 119, of the March term, A. D. 1819, and now remaining of record in the Superior Court of the said county of Newcastle. And it appearing to this court that the sale of the thirty-six shares of the stock of the Bank of Wilmington and Brandywine standing in his name on the books of the

said Bank made by the said Samuel McDowell to Robert Porter, in the month of January, A. D. 1829, for the sum of three hundred and sixty dollars, was without sufficient cause and inequitably hindered and prevented by the said respondents and that the dividends on the said stock do not amount to as great a sum as the interest upon the said purchase money, it is further ordered and decreed that the said respondents pay to the said Samuel McDowell the sum of one hundred and eight dollars in lieu of the dividends declared on the said thirty-six shares of stock between the month of January, A. D. 1829, and the month of February, A. D. 1834, and that the said dividends declared on the said thirty-six shares of stock between those periods be retained by the said respondents for the use and benefit of the said Bank of Wilmington and Brandywine, leaving to the said Samuel McDowell his legal and equitable rights as to the sale and transfer of the said thirty-six shares of stock, and of demanding and receiving any dividends that have been or may be declared thereon since the month of January, A. D. 1834; and it is further ordered and adjudged by this court that the said respondents pay the said sum hereby decreed to be paid, and also the costs of this suit in the court of Chancery, and the costs on this appeal in ninety days from the date of this decree, or that a writ of sequestration issue."

*J. A. Bayard,* for appellant.
*Wales* and *Rogers,* for respondents.